## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**DIANA STOCKTON,** derivatively on behalf
of Nominal Defendant GlobeTel Communications Corp.,

06 - 609

CV-COHN

      **Plaintiff,**

**v.**

**J. RANDOLPH DUMAS, TIMOTHY HUFF,
JONATHAN D. LEINWAND, FERDINANDO
SALLEO, DORIAN KLEIN, MICHAEL
CASTELLANO, KYLE McMAHAN,
MITCHELL SIEGEL, CHRISTOPHER MEYER, and
LAINA RAVEENDRAN,**

      **Defendants,**

**and**

**GlobeTel Communications Corp.,**

_____ **Nominal Defendant.** _____/

### VERIFIED SHAREHOLDER DERIVATIVE   PETITION

Plaintiff Diana Stockton, by her undersigned counsel, hereby files this Verified

Shareholder Derivative Petition against Defendants J. Randolph Dumas ("Dumas"),

Timothy M. Huff ("Huff"), Jonathan D. Leinwand ("Leinwand"), Ferdinando Salleo

("Salleo"), Dorian Klein ("Klein"), Michael Castellano ("Castellano"), Kyle McMahan

("McMahan"), Mitchell Siegel ("Siegel"), Christopher Meyer ("Meyer"), and Laina

Raveendran ("Raveendran") and alleges as follows:

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff for the benefit of

Nominal Defendant GlobeTel Communications Corp. ("GlobeTel" or the "Company")

L:\1226-001\15734 doc

against Defendants Dumas, Huff, Leinwand, Salleo, Klein, Castellano, McMahan, Siegel, Meyer and Raveendran for breaches of their fiduciary duties owed to GlobeTel during the period from December 22, 2005 through the present (the "Relevant Period").[1]

## VENUE

2.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(3) in that Plaintiff and Defendant are citizens of different states and citizens of foreign countries are involved and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

3.       Venue is proper in this Court because Nominal Defendant is located within this county.  Further, one or more Defendant has received substantial compensation in this district by engaging in numerous activities and conducting business in this district.

## PARTIES

4.       Plaintiff, Diana Stockton, as set forth in the Verification, is and was during the Relevant Period through the present, a shareholder of GlobeTel.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation.  Plaintiff is a citizen of the State of Texas.

5.       Nominal Defendant GlobeTel was established in July 2002.  GlobeTel is engaged in the business of providing telecommunication services, primarily involving Internet telephony using Voice over Internet Protocol ("VoIP") technology and

---

[1]  Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between December 22, 2005 and April 11, 2006, the Relevant Period continues through this day instead of ceasing on April 10, 2006, the day before the public became aware of the wrongdoing of Defendants.

equipment, Stored Value services, and wireless communications both domestically and internationally, including Mexico and certain countries in South American, Europe and Asia.   In addition, GlobeTel's subsidiary, Sanswire Networks, LLC, is developing a national Wireless Broadband Network utilizing high-altitude airships called Stratellites that will be used to provide wireless voice, video, and data.

6.     GlobeTel is a corporation organized under the laws of the State of Delaware and is headquartered in Pembroke Pines, FL.   The address of its Principal Executive Office is located at 9050 Pines Boulevard, Suite 110, Pembroke Pines, FL 33024.

7.     The Company's Board of Directors currently consists of six (6) members. Collectively, the Board owns approximately less than 6.5% of the Company's common stock.

8.     Defendant Dumas is a citizen of London, England.   Dumas, at all relevant times, served as a member of the Board of Directors.   Dumas is currently Chairman of the Company's Board of Directors.

9.     Defendant Huff is a citizen of the State of Florida.   Huff, at all relevant times, served as a member of the Board of Directors.   Huff also serves as the Company's Chief Executive Officer.

10.     Defendant Leinwand is a citizen of the State of Florida.  Leinwand, at all relevant times, served as a member of the Company's Board of Directors.  Leinwand is also the Company's General Counsel.

11.     Defendant McMahan is a citizen of the State of Florida.  McMahan, at all relevant times, served on the Company's Audit Committee, Compensation Committee and Nominating Committee and is a member of the Board of Directors.

12.     Defendant Klein is a citizen of the State of Florida.  Klein, at all relevant times, served on the Company's Audit Committee, Compensation Committee, Nominating Committee and is a member of the Company's Board of Directors.

13.     Defendant Siegel is a citizen of the State of Florida.  Siegel, at all relevant times, served as a member of the Company's Board of Directors.

14.     Defendant Castellano is a resident of the State of Florida.  Castellano, at all relevant times, served on the Company's Audit Committee, Compensation Committee, and Nominating Committee.  Castellano is also a member of the Company's Board of Directors.

15.     Defendant Salleo is a citizen of Rome, Italy.  Salleo, at all relevant times, served as a member of the Company's Board of Directors.  Salleo will replace Defendant McMahan's position on the Audit Committee following the Annual Meeting on or about June 21, 2006.

16.     Defendant Meyer is a citizen of Florida.  Meyer served as Chairman of the Board of Directors in September 2005 until his resignation in March 2006 to become Chairman of GlobeTel's International Advisory Board.

17.     Defendant Raveendran is a citizen of the State of Florida.  Raveendran served as a member of the Board of Directors from February 2005 until her resignation on December 27, 2005.

18.     Defendants Dumas, Huff, Leinwand, Ferdinando, Klein, Castellano, McMahan, Siegel, Meyer, and Raveendran are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of GlobeTel's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

19.     The Individual Defendants, as senior officers and/or directors of GlobeTel, were controlling persons of the Company.  Each exercised their power and influence to cause GlobeTel to engage in the fraudulent practices complained of herein.

20.     Each of the Defendants are liable as a participant in a fraudulent scheme and course of business by disseminating materially false and misleading statements and/or concealing material adverse facts.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

21.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the

fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

22.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained herein.

23.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies and practices and controls of the Company.  By virtue of such duties the Individual Defendants were required to, *inter alia*:

     a.    Exercise good faith to ensure that the Company was operated in an diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

     b.    Exercise good faith in taking action to correct any misconduct and prevent its recurrence when placed on notice of improper or imprudent conduct by the Company and/or its employees.

24.    The Individual Defendants, particularly the Officers and members of the Board of Directors' Audit Committee, were responsible for maintaining and establishing

adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. Further, the Audit Committee was responsible in evaluating the independence and performance of making recommendations to the Board with respect to the appointment of the Company's independent accountants, evaluating the independence and performance of such accountants, reviewing the scope of the annual audit, and reviewing and discussing with management and the independent accountants the audited financial statements and accounting principles.

25.    GlobeTel's Compensation Committee is responsible for reviewing the compensation of the executive officers of the Company and its subsidiaries, recommending to the Board the salaries and any bonus or cash incentive plans for such executive officers, and administering the Company's long-term incentive compensation plans.

26.    The Company's Governance and Nominating Committee is responsible for corporate governance matters, the initiation of nomination for election as a director of the Company, the evaluation of the performance of the Board of Directors, and the determination of compensation of outside directors of the Company.

## SUBSTANTIVE ALLEGATIONS

27.    The Defendant directors face a substantial likelihood of liability in this action because the Company issued false and misleading statements concerning the Company's business practices, internal controls, and omitted material information regarding GlobeTel's falsified financial results.  The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces

7

substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight.   These Directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company as the Company's common stock traded at artificially inflated levels.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE RELEVANT PERIOD

28.     Throughout the Relevant Period, defendants issued several statements which touted the consummation of a $600 million deal with a Moscow-based company named LLC Internafta ("Internafta"), to install wireless networks in Russia's 30 largest cities.   The truth, however, was that no such company existed and that the deal, like many of GlobeTel's other business ventures, was in reality a sham.

29.     On December 30, 2005, the Company announced a "binding agreement" valued at $600 million in telecommunications and internet services with Moscow-based Internafta in a press release entitled, "GlobeTel Wireless to Install $600 Million WiMax Wireless Network in 30 Largest Russian Cities."   The press release stated in part:

> FORT LAUDERDALE, Fla. – (BUSINESS WIRE) – Dec. 30, 2005 – GlobeTel Communications Corp. (AMEX:GTE) today announced that its GlobeTel Wireless subsidiary has entered into a binding agreement to install wireless communications networks in 30 cities throughout the Russian Federation, providing broadband, VoP and DECt technologies.
>
> GlobeTel Wireless has entered into an agreement with LLC Internafta ("Internafta") of Moscow, Russia, whereby Internafta will pay to GlobeTel Wireless a series of four construction payments totaling US $600 million for the installation of an array of proprietary networks to be installed in Russia's 30 largest cities, starting with Moscow and St. Petersberg.   GlobeTel Wireless will both manage the completed network and will retain an ongoing 50% shareholding in the operations of the network, allowing the Company to enjoy the

significant benefits of the recurring revenue stream.   GlobeTel plans to roll out the network in 3 stages, comprising 10 cities each, over the next 27 months.

Over the past six months, GlobeTel has had a number of key meetings with officials at various level of the Russian Government, including senior members of the Russian Parliament (the "Duma") and various branches of the Russian telecommunications and technology establishment.   In early October, following months of preliminary discussions, GlobeTel CEP Timothy Huff – along with GlobeTel Wireless President, Uli Altvater and Sanswire President Bob Jones – demonstrated a working version of the HotZone 4010 equipment that will form the backbone of the new 30-city network. At that demonstration, the HotZone 4010 system successfully provided internet and DECT phone connectivity inside the Duma Building, quickly establishing its capabilities and ease of use. Largely upon the strength of that presentation, GlobeTel immediately entered in substantive negotiations with a group of prominent Russian investors for the implementation of the network which has resulted in today's agreement.

"It is beyond exciting to be able to bring this level of connectivity to Russia," said GlobeTel CEO Tim Huff.  "Russia will, quickly and at a relatively modest cost, have a wireless infrastructure that will rival any in the industrialized world.    This presents an amazing opportunity for us, for Russia and for our Russian partners.  The Russian Internet market is severely limited by a lack of infrastructure and by the high cost to individual users of obtaining high speed internet access, even in those relatively rare cases where it is available.  The GlobeTel Wireless network will provide city-wide high speed, wireless connectivity with the ability to provide voice-over IP telephony along with residential and business-based DECt service.   DECt technology, particularly in conjunction with low-cost VoIP service, is the key to delivering highly affordable wireless telephone and broadband access to areas with limited or high cost service."

"Completely apart from the obvious economic rewards associated with an investment in this exciting new communications technology, we are most proud of the social, educational and community benefits that we are able to facilitate as part of the dramatic quality-of-life attributes which are rapidly emerging throughout the Russian Federation," stated Maxim Chernizov, one of the Founding Principals of Internafta.  "This initial step with GlobeTel – along with other very significant technology breakthroughs to follow – will prove to be significant for all of us in the relatively near-term," he

continued.

Uli Altvater, President of GlobeTel Wireless stated: "This is a very large undertaking that will utilize the skills or more than 1,000 people in Russia, Europe and the United States. This transaction will catapult GlobeTel to a position as one of the top two suppliers and operators of wireless networks in the world."

\* \* \*

30.     On news of this announcement, GlobeTel stock surged from $2.19 to $3.68 per share, an increase of $1.49 or over 75%, on extremely heavy volume.

31.     On January 9, 2006, Defendants provided additional details of the Russian deal, including the planned operation of the installed networks by their NuTel Wireless ("NuTel") joint venture, in a press release entitled, "ADDING and REPLACING GlobeTel Cities Details of Russian Wireless Agreement." The press release stated in part:

FORT LAUDERDALE, Fla., Jan 09, 2006 (BUSINESS WIRE) –

GLOBETEL CITES DETAILS OF RUSSIAN WIRELESS AGREEMENT

GlobeTel's (AMEX:GTE) entry into the Russian communications market is the culmination of more than a year of meetings with Russian investors, members of the Russian Parliament and leaders of the Russian technology sector. The successful results of those discussions and final negotiations were released by GlobeTel to its shareholders and to the public on December 30 2005. In order to further clarify the nature of the transaction, GlobeTel Communications Corp., today has provided below the following additional information about the transaction. The full contract may be viewed as part of the company's 8-K filing with the SEC on January 6, 2006.

Q.     Who are the counterparties to the Russian Agreement?

A.     GlobeTel Wireless, GlobeTel's wholly-owned subsidiary, has entered into a binding contract with LLC Internafta ("Internafta"). Internafta is a private Russian special purpose corporation formed by a group of wealthy Russian investors) the "Investors" or "Internafta") for the specific purpose of deploying GlobeTel's

proprietary wireless communications systems throughout the Russian Federation.

Q.    How much is being invested and when will the payments begin?

A.    Internafta will pay to GlobeTel a total of US $600 million in order to acquire and to install GlobeTel's wireless networks in 30 of the

Russian Federation's largest cities.  Internafta will make a series of "progress payments" which are both time- and progress-based. The first installment will be paid this month.  This firs US $150 million payment represents a construction deposit that will allow GlobeTel to initiate the assembly of the equipment necessary for the network installation in an initial group of 10 cities.  As each of three groups (of 10 cities each) achieves a 50% completion rate, a US $75 million progress payment will be released to GlobeTel. Upon 95% completion of any city group, a remaining US $75 million payment will be released for that city group.  Ultimately, then, as each of the three city groups achieves, first, a 50% and then a 95% completion rate, six US $75 million progress payments, plus the initial deposit of US $150 million, will have been made to GlobeTel Wireless, totaling US $600 million.

Q.    How much time will be required for GlobeTel to install the total network?

A.    GlobeTel currently estimates that the entire network will be fully installed over a 27 month period.  Although the full network installation is estimated to occur over this period, fee-paying subscribers are expected to be brought onto the network in phases. After a 60-day "planning and preparation" phase starting on February 1st, the installation is expected to begin on April 1st.

Q.    Who will operate the network?

A.    The network will be operated by NuTel Wireless ("NuTel"), a Russian company which will be owned 100% by a European Joint Venture company which is being established by GlobeTel and Internafta.  Each party will own 50% of the shares of the European JV Company which owns NuTel.  NuTel Wireless is a newly-incorporated Russian operating company.  The Operation Control Centers responsible for operating, monitoring and maintaining the network will be located in Russia (Moscow), in Germany and at our Network Operations Center in Florida.

\* \* \*

32.     On January 31, 2006 and March 3, 2006, the Company issued press releases explaining why GlobeTel had not yet received the necessary funding from Internafta.

33.     On March 13, 2006, Defendants stated that if Internafta did not provide the required funds within one week, GlobeTel would exercise the right to cancel the contract, in a press release entitled, "GlobeTel Communications Updates Status of Joint Venture with LLC Internafta."  The press released stated in part:

> FORT LAUDERDALE, Fla. – (BUSINESS WIRE) – March 13, 2006 – GlobeTel Communications Corp. (AMEX:GTE) today provided a brief update on the status of the Russian network negotiations.
>
> CEO Timothy Huff stated, "On March 2, we advised our shareholders that Internafta requested an additional delay in the closing of the funding until the week of March 6.  Since then, GlobeTel has provided Internafta and its banks with a significantly expanded business plan outlining in detail the company's program for equipment manufacturing, delivery, installation, testing, monitoring, staffing, progress payment requirements, and other pertinent information.  Internafta advised us that is funding has been approved by its bank syndicate, subject only to the bank's final review and analysis of this GTE business plant.
>
> "Although the contract signed between GlobeTel and Internafta did not specify such a financing of Internafta's funding obligations, and while GlobeTel did not anticipate that such a financing by Internafta would emerge as it has, we have agreed to a continuance of the contract with Internafta until the end of this week, pending a final decision by Internafta's bank regarding a funding commitment secured by Internafta's assets.
>
> "Should such a funding commitment not be forthcoming by the end of this week, or unless the banking syndicate provides written assurances to GlobeTel of the imminent delivery of such commitment, GlobeTel will have no choice but to exercise its right to default the contract for non-payment.  This outcome would be

12

unfortunate given the time and effort that our entire staff has dedicated to this transaction. However, we're committed to more than twenty other GlobeTel Wireless network projects requiring our time and attention. Further delays in the closing of the Internafta transaction would only serve to distract our team from these immediate opportunities."

\* \* \*

34.    On March 13, 2006, the stock price of GlobeTel declined from $3.23 to $2.56 per share, a drop of $0.67 or 20%.

35.    Then, on March 17,2 006, GlobeTel issued yet another press release, explaining why the Russian deal was once again on and moving forward, entitled, "GlobeTel to Revise Payment Terms of Agreement with Internafta, Extend Time for Payment." The press release stated in part:

> FORT LAUDERDALE, Fla. – (BUSINESS WIRE) – March 17, 2006 – GlobeTel Communications Corp. (AMEX:GTE) today announced that based upon differences between the Company and Internafta on the financing process, the parties have agreed to revise their agreement to more accurately reflect the timing of payments GlobeTel expects to receive for the build out of the 30 city wireless networks in Russia and allow Internafta additional time to begin making payments.
>
> Internafta has informed GlobeTel that its bank recommends that smaller, more frequent, progress payments be established so that the necessary staged payments can be delivered to GlobeTel as and when the network is delivered and installed. These smaller, more frequent, staged payments do not reduce the total capital value of the agreement with GlobeTel Wireless or change any other terms of the agreement. GlobeTel will still receive $600 million for deployment of the network. The exact amount of the new proposed initial deposit, and the size and timing of the new proposed progress payments, will be discussed and agreed with GlobeTel once the bank has completed its due diligence and when the bank group formally accepts the terms of Internafta's proposed banking instrument.
>
> The December 2005 contract called for four equal payments of US $150 million each, of which the first payment, representing an initial

13

deposit, was to be received by GlobeTel in January 2006.   On January 23, 2006, Internafta presented to GlobeTel a document represented to be a Standby Letter of Credit drawn on Banco do Brasil S.A. (Rio de Janeiro) in the amount of $300 million.   This Standby Letter of Credit was provided to facilitate the first phase of the network construction.   The banking instrument had a maturity date of two years and needed to be confirmed and accepted by a correspondent bank before GlobeTel could receive any funds from the instrument.   The terms and conditions of what constituted an acceptable and functional banking instrument as it related to the December 2005 contract became a matter of interpretation between the parties.   After extensive negotiations, Internafta agreed to take sole responsibility for facilitating the financing of their banking instrument in order to be able to present readily-available funds to GlobeTel.

Timothy Huff, CEO of GlobeTel stated, "We are in constant communication with Internafta and believe that so long as we feel they are continuing to work in good faith and so long a substantive progress if being made on the transaction, it is in the best interests of GlobeTel and its shareholders to allow the process to continue to its ultimate conclusion.   This is a very large transaction that requires solutions to many commercial issues, the implementation of tailored banking faculties, and the conformance to many international treaties, regulatory requirements and legal matters. The parties continue to work in good faith and remain committed to building a state-of-the-art wireless network in Russia.   We feel that the process must be given every reasonable opportunity to succeed given the commercial stakes involved."

GlobeTel is in regular contact with Internafta, both in person and via a series of telephone conference calls, concerning the progress of the transaction.   Floyd Bradley, Managing Director of GlobeTel Wireless, met with Maxim Chernizov, the Director General of Internafta, on March 13th and again on March 15th in Germany in order to represent GlobeTel's interests in the ongoing banking process.

During those discussions, Internafta informed GlobeTel that its banking instrument is being syndicated by a consortium of banks and that the lead institution is a major European bank, instead of the bank that GlobeTel has started the process with.   Internafta has stated that the banks have successfully completed their due diligence regarding the underlying assets of Internafta's shareholders that collateralize the banking instrument.   The remaining financing procedures are now under the control of the

14

lead bank, and GlobeTel has been told by Internafta that all financial institutions involved in the syndication process are attempting to facilitate the transaction on a "time-is-of-the-essence" basis.

However, Internafta has also informed GlobeTel that the lead bank requires additional time in order to secure an external expert opinion to verify both the feasibility of, and GlobeTel's ability to implement, the business plan for the Russian network. GlobeTel has been told that the bank and its external expert advisors are currently evaluating the business plan that was developed by GlobeTel as part of the commercial justification of the planned Russian network. This expanded version of the business plan was recently delivered to Internafta as required by the lead bank's project financing and due diligence process.

\* \* \*

36.    On news that the Russian deal would proceed, the stock rebounded, increasing from $2.33 to $2.83 per share, an increase of $0.50 or 21%.

37.    To this date, nothing has occurred in connection with the Russian deal.

38.    On April 11, 2006, Seth Jayson, writing for The Motley Fool (TMF"), published a shocking report, which revealed that the Company's joint venture deal with the Moscow-based Internafta – which roughly translates to "international oil" lacked any real sense of credibility, much less one capable of undertaking and financing a $600 million telecommunications deal. The article, entitled "The GlobeTel Silent Treatment," stated in part:

Florida's been providing me with a lot of interesting reading lately. Last week, the first bit was a letter sent to me by a lawyer for GlobeTel (AMEX:GTE). In it, he tells me that GlobeTel "in order to protects [sic] its interests and those of its shareholders, will no longer continue to communicate with you."

"Accordingly," it continues, "this will constitute a formal request that you immediately cease-and-desist from any further communications or inquiries ... GOVERN YOURSELF ACCORDINGLY."

That's a pretty ironic request, given that GlobeTel CEO Tim Huff

has previously complained that I didn't try hard enough to talk to him.  The real problem, of course, is that I ask hard questions, unlike some of the GlobeTel PR regurgitators and apologists out there in the press.  That's because it's my job to look out for investors, and I think GlobeTel is one of the worst investment ideas out there.

But after reading GlobeTel's latest annual report, it's easy to see why the company would want to instill an official silent treatment.  In past conversations, CEO Tim Huff seemed more comfortable talking about his plans for the future, or the important foreign government men involved in the company's far-flung business deals.  He showed little interest in explaining the firm's financial woes, or its long list of past ventures that failed to live up to the original promises, such as the very strange Australian deal.  Investors should pay close attention to that, and GOVERN THEMSELVES ACCORDINGLY.

The ugliest thing in Florida.

The raw numbers alone ought to be enough to frighten investors.  For 2005, this now two-buck-and-change stock lost $0.43 per share, or $32 million dollars.  That's 2.5 times greater than 2004's net loss of $13 million, even though revenues increased 179%, to $81.1 million.  Of course, losing money like that is an easy task when you only take in a gross profit of $413,679 on that $81 million.  To put that into context, $413,679 was less than half of GlobeTel's travel budget for the year.

The reason the bottom line didn't look even worse on a per-share basis was that shareholders saw their stake watered down by a whopping 50% increase in diluted shares.  The share count is skyrocketing, of course, because GlobeTel keeps this money-losing strategy rolling by selling shares and other instruments like convertible debt - to the tune of $15 million last year.

The cash burned by operations was $12.6 million in 2005, and management makes its dependence on financing perfectly clear, for those who take the time to comb through the 10-K.  Refer to page 34, where it says "… additional cash will still be needed to support operations … [i]f we are unable to obtain the necessary funding, the company may have to modify its business plan, reduce or discontinue some of its operations or seek a buyer for all or part of its assets to continue as a going concern through 2006."

But while outside shareholders are left with the risk and double the

16

pain on the bottom line, officers and directors are doing just fine, thanks. Their compensation rose 85% last year to a combined $12 million, or 15% of sales, much of it in stock. By the way, many of them have been planning to sell that stock over the past few months. I find that odd. If I held a large chunk of shares in a company that was about to bust open a $600 million Russian WiMax deal, I'd hang onto all of them. I'd buy more whenever I could. In other words, I'd GOVERN MYSELF ACCORDINGLY.

Leader in wireless?

Believing in the GlobeTel story requires you to believe that a tiny, money-losing Florida firm can somehow leapfrog the big boys in telecommunications. Tim Huff told me on the phone that the reason his firm would beat established equipment and service providers like Nokia (NYSE:NOK), Motorola (NYSE:MOT), Vimpelcom (NYSE:VIP), and Mobile Telesys (NYSE:MBT) is because of the superiority of its technology – specifically, its "radios." If that's true (and more than one telecom analyst has written to me to express major doubts), then GlobeTel must have one of the most efficient R&D machines in the world. According to the 10-K, total R&D for the year was just more than $2.3 million, and 99% of that sum went to the blimps.

The trail of tears

GlobeTel's big splash in December was for its Russian WiMax deal, the one that was supposed to deliver them hundreds of millions of dollars by now, but which has mostly produced press releases. This came as no surprise to me, because I've taken the time to read GlobeTel's past filings, and I know that delays and cancellations are par for the GlobeTel course.

Investors who wish to double-check GlobeTel's past record on hog-sounding deals should begin with page six of the annual report, where they will find many entries that look like this. "In February, 2005, we signed a Letter of Intent (LOI) with Banco Azteca, the fifth largest financial Institution in Mexico … However, based on the business terms presented, the company has decided not to move forward with this deal." In all, of the 10 deals listed on pages six and seven alone, six were cancelled outright, and the rest were rescheduled or otherwise delayed.

More interested in the deals promoted in 2005? Direct your gaze to the pages beginning with 50, and you'll see the updates on more recently announced project like the July 7 Daly Dumas joint venture

agreement, the July 14 Columbian blimp deal, the July 7 RapidMoney deal, the Aug. 2 German wireless deal, the Oct. 6 Global Crossing (Nasdaq:GLBC) deal, the Oct. 12 University of Stuttgart Deal, the Dec. 31 Russian WiMax deal, and the Nov. 9 Indian financial services deal – none of which has yet yielded any transactions 'that would require recording or disclosure in the Company's financial statements related to this agreement." If you think "the money must be on the way," I suggest you go back to page six and read again.

Reconsider all those deals, consider what was said about them at the time, and look at what has happed since. Then, GOVERN YOURSELF ACCORDINGLY.

Chamber of oddities

If you're unmoved by large losses and unfulfilled deals, consider some of the other odd tidbits to be found in the 10-K. One of my favorites is the page 42-43 description of the "milestone" payments made to acquire GlobeTel's "HotZone" wireless technology.

"Initially, since the milestones to be achieved for the second and third years of the contract were undefined and it is unknown whether or not such milestones, even if defined, will be achieved, the Company had not recorded the additional consideration … Subsequently, as of Dec. 31, 2005, the Company and HotZone agreed that any and all milestones, previously undefined, were in fact achieved."

So, the non-existent milestones were judged fulfilled, and the company recorded further payments of $5 million worth of stock. (While you're on page 43, you might want to review the deal that brought Huff to GlobeTel: a "consulting" deal involving his previous company, Global VoIP and "Charterhouse," a Nevis, then Malaysian, company for a GlobeTel buildout of five networks. The payment to GlobeTel was to be 64 million (later 86 million) shares of an unlisted Australian company, one that ended up being liquidated a year and a half later, causing GlobeTel to write off the entire amount. Instead of being "directly compensated" for this (to my mind, wildly unsuccessful) deal, Tim Huff became an officer and director of GlobeTel.

Another interesting deal is the cash and stock payment of ISG Jet, a company owned by GlobeTel's executive vice president, one Steven King, for "executive air travel services." ISG Jet is owned by King's holding company INV Group (according to Florida

18

records, formerly InvestorSource Group) and has, according to the record here, filed planned sales of more than $2.8 million worth of GlobeTel stock since June of 2005.

And while we're on the subject of insider sales, one of those questions that GlobeTel doesn't seem to want to answer is whether CEO Tim Huff is a 40% investor in an outfit called Infidelity Capital Partners, as he is described in a 2002 registration statement.  By virtue of the convertible note originally ascribed to Infinity, and later, it seems, ascribed to an unnamed "entity" 40% owned by Tim Huff, it looks like we're talking about the same "entity."  (It appears most recently page 49 of the latest 10-K).

I find this interesting because one Infinity Capital Partners has been filing planned share sales this past year.  If Huff is still an investor in this Infinity, I'd like to know how he squares those sales with his claims to me that he has "not sold" shares.  Since GlobeTel is giving me the silent treatment, maybe investors will ask for some clarification, consider the answer, and GOVERN THEMSELVES ACCORDINGLY.

Foolish bottom line

GlobeTel is a great company to watch if you want to learn about complicated (often unfulfilled) business deals, group investor psychology, and money-burning penny stock.  If you're looking for a foreign telecom player that can product little things like earnings and cash – you know, the stuff that makes an investment ultimately pay off – I suggest you look elsewhere.  As for GlobeTel, read the filings, look at the director turnover (page 70) in 2005, look at the recent insider selling, consider how management is rewarding itself richly while outside shareholders bear the brunt of the huge losses and dilutive financing arrangements, and GOVERN YOURSELF ACCORDINGLY.

* * *

39.    On the news of April 11, 2006, the price of GlobeTel shares plunged 15%, on unusually high volume, falling to $1.78 per share, for a one-day drop of $1.78 per share.  During the Relevant Period, the stock traded as high as $3.92.  As a result, investors have lost millions of dollars as a result of the acts and omissions complained of herein.

40.    On May 1, 2006, TMF published another article entitled "Just Say Nyet,"

providing further details regarding the bogus nature of the Russian deal, stating in part:

> Let's not belabor the point, OK?  No one should be shocked that
> GlobeTel (AMEX:GTE) finally announced the end of its much-
> discussed, supposedly $600 million WiMax deal with a group of
> Russians.
>
> Investors who like a slick story but aren't as big on reading the
> details ought to learn a lesson as well.  Toward that painful but
> noble goal, let's review, shall we?
>
> Until late 2005, tiny GlobeTel was best known for its audacious
> claims about Internet blimps (which have yet to fly).  At the end of
> December, GlobeTel said it had made a deal in Russia that would
> have vaulted it to the top tier of phone, Internet, and networking
> providers, joining the likes of Nokia (NYSE:NOK), Motorola
> (NYSE:MOT), Cisco (NASDAW:CSCO), Avaya (NYSE:AV),
> Vimpelcom (NYSE:VIP), and Mobile Telesys (NYSE:MBT).
>
> I was pretty skeptical, because, well … when a company claims to
> have a single deal that's four times its market cap, that doesn't
> sound right.  I took the time to do some digging, and it didn't take
> long to discover that big promises with little payoffs are quite
> common with GlobeTel, along with even stranger stories.
> Unfortunately, the mainstream biz press saw fit to engage in what
> typically passes for journalism:  Parrot the press releases, make a
> few calls, quote a few talking heads.
>
> Read all those filing?  Run biographical searches of board and
> management on Yahoo! And the SEC website?  Bah!  All is well,
> right?  Why be a Wilma Worrywart?
>
> Because the writing was on the wall.  And investor money was on
> the line, that's why.
>
> Things started to fall apart months back, with delays.  Then a final
> press release put the issue to rest, for a while.  Then came the
> annual filing that shows just what lousy shape GlobeTel's finances
> are in, on the heel of a vague threat from GlobeTel's lawyers, which
> loosely translated to "Hey Fool, stop asking us questions."
> Meanwhile, it looked to me like far too many insiders were heading
> for the lifeboats, with a lot of director turnover, and share-sale
> statements that looked mighty odd for insiders in a company
> supposedly on the verge of profiting from so many great

breakthrough deals.

Today, the final shoe dropped, with GlobeTel releasing a statement declaring a "formal default" by the Russians. It's worth a careful read, because it shows just how thin GlobeTel's previous claims look in comparison to this later version of the story. Take this gem: "Internafta subsequently delivered to GlobeTel terms of a US $300 million Letter-of-Credit on Banco do Brazil letterhead. It was thereafter determined by GlobeTel that the terms were not acceptable to any of GlobeTel's bankers."

It was thereafter determined that the terms were not acceptable? Why not? Are we talking about funny money here? Fake credit? Insufficient funds? What?

Or, more to the point, why release all the sunny PR beforehand if the financing – as well as the detailed business plan, according to this latest release – was still up in the air? I'm guessing that's just another one of those questions GlobeTel won't want to answer, but I'm hoping a few shareholders will ask it. (And since GlobeTel won't talk to me, feel free to send me the answer. My email's at the bottom of this article).

The rest of the release looks like another excuse-o-rama to me, with the typical verbiage aimed at explaining how this certainly isn't GlobeTel's fault – a bone tossed to the faithful. GlobeTel says it will "open itself up to new negotiations with other significant parties in Russia, including an important entity that has approached GlobeTel, regarding a wireless network installation in Russia."

I don't buy that last bit, but I do think it's possible that GlobeTel was outmaneuvered by the still-mostly-nameless Russian federation. But I won't be crying too many tears for GlobeTel managers and their $12 million worth of compensation last year – on gross earnings of only $413,729.

The real victims in this ordeal are those unfortunate investors who loaded the boat on GlobeTel and believed in all that copious press back in the beginning of the year. The stock has tanked more than 60% since early January. Anyone who's tempted to get back into this game should take a hard look at the record, and take this advice, which was sent to me by a lawyer on behalf of the good folks at GlobeTel themselves: GOVERN YOURSELF ACCORDINGLY.

41.     On May 22, 2006, the New York Post published an article *Act Now,*

*AMEX*, in hopes of the American Stock Exchange to halt trading shares of GlobeTel.

The article stated, in relevant part:

> May 22, 2006 – IT'S time for plain speaking.   In the name of
> decency and respect for the law, the American Stock Exchange
> must halt trading in the shares of GlobeTel Communications Corp.
>
> The Amex needs to act now, and if the bosses there won't', then
> the national Association of Securities Dealers has to do it for them.
> And if the NASD won't act, then the Securities and Exchange
> Commission has to do the deed.  One way or another, this penny
> stock vampire must be exorcised from the capital markets.
>
> Over the last year, this column has devoted considerable space to
> chronicling the nose-thumbing antics of the GlobeTel bunch as they
> have pirouetted from one see-through ploy to the next to create the
> illusion of value in a worthless penny stock.
>
> In the process, they have put his ridiculous hologram of a company
> through two complete pump-and-dump cycles that have sent an
> astounding 1.1 billion shares of its stock churning through the
> market, climbing from mere pennies to a split-adjusted February
> 2005 high of $5.25 a share.
>
> The result:  a bogus $350 million market value for the company,
> two-thirds of which has now evaporated, with $74 million of it
> detouring into the outstretched hands of the company's insiders.
>
> And through it all, the regulators have done nothing.  They did
> nothing in the spring of 2004 when the company erupted in absurd
> stock-hyping claims regarding a new way to relay cell-phone
> signals from Latin America to the U.S.  The plan:  bounce the
> phone calls of aluminum blimps 65,000 feet over the jungles of
> Colombia.
>
> To prove it meant business, the company said it would put its first
> blimp into orbit in January 2005.  But the deadline came and went
> without a launch – the company didn't have a blimp that could get
> even 3 inches off the ground, let alone reach the edge of outer
> space.
>
> By last December, the missed deadlines were piling up, and the
> company switched from its limp blimp riff to a whole new pump-

and-dump ploy, this one featuring plans to construct $600 million worth of cell-phone relay towers in Russia.

Like the firm's baloney-stuffed blimp shtick, the Russian yarn featured a group of allegedly Croesus-rich (as well as unknown) offshore moneymen, who never materialized.  And in spite of all that – and a hundred other outrages – still the regulators have done nothing.

Now GlobeTel has begun a whole new fan dance, this time featuring plans to sell prepaid phone and debit cards to Brazilians looking for way to move cash in and out of the U.S. unobtrusively.

In keeping with each of its previous adventures, the new one features the nearly simultaneous arrival on the scene of an impressive-sounding new board member:  former Italian Ambassador to the U.S. Ferdinando Salleo.

Where has GlobeTel been getting this window dressing?  To judge from the company's latest round of press releases on the matter, they've mostly been coming, indirectly at least, by way of former Secretary of State Henry Kissinger and a London-based investment firm he supposedly founded called Rubikon Partners.

Like everything else involving GlobeTel, Rubikon Partners seems impressive.  Its Web site states that the firm maintains offices around the world, and that it was founded in 2003 by Kissinger and four other individuals, including his current consulting world partner, Thomas ("Mack") McLarty, Bill Clinton's White House chief of staff.

Rubikon also seems to have a "strategic advisory board," which the Web site implies that Kissinger heads and which is said to be composed of "highly distinguished" global business leaders.

Unfortunately, beyond the bombast is the truth:  Far from being a network of business world big-timers, Rubikon Partners looks to be not much more than a one-office outfit running what U.K. authorities say is an unregistered Internet bank that investors should avoid.

One might find it odd, for example, that Rubikon's Web site gives a phone number and address for the firm's office in Milan, but it does not list the name of the person in charge.  The reason is simple: the Milan office has no such person!

As for Rubicon's offices in New York and Washington, D.C., they don't seem to exist at all.  In fact, no phone number or address for

Rubikon Partners can be found anywhere in the U.S. – not even as a courtesy listing by Kissinger at his offices in New York and Washington.

Yet that hardly seems surprising given a statement by Kissinger to The Post last week that he was never a founding partner of Rubikon, and that he has no role in the firm now, either.

In fact, a search of British corporate filings shows that Rubikon Partners was actually started in London in 2001 by an ex-Bankers Trust and Merrill Lynch executive named Dorian Klein.

The filings show Klein's partner at Rubikon was another ex-Bankers Trust man in London named J. Randolph Dumas, who had worked earlier in this career as a briefing officer for the Central Intelligence Agency in Washington.

By contract, Kissinger's name is nowhere to be seen, on those or any subsequent filings.

By the time Rubikon was set up, Dumas had already become involved as a consultant to he bunch running GlobeTel.   And though the launch of Rubikon certainly must have helped him dress up his act, it doesn't seem to have led to much in the way of new business, a fact that may explain the increasing and deepening interest of both men in GlobeTel's affairs.

Simply put, GlobeTel may have been the best opportunity they had going.

Their involvement began to deepen in earnest in the spring of 2005 when Dumas began promoting GlobeTel's blimp pipe dreams around Europe.

When the company's chairman, a Polish-born moneyman named Przemyslaw Kostro, abruptly quit in September, the company surprisingly surfaced the name of Britain's recently retired ambassador to the U.S., Sir Christopher Meyer, as its new chairman of the board – no doubt with the help of the Rubikon duo.

For this part, Meyer didn't stick around long, and after six months on the job, he quit last March, agreeing to linger on only in a kind of figurehead role.

The new job:   Chairman of GlobeTel's so-called "International Advisory Board," a seemingly nonexistent body that the company has not said peep about since.

With Meyer's departure, the door swung open for Dumas to become chairman, while freeing up a board seat for his sidekick, Klein.

Last week, the two reached into the Rubikon bullpen for a third reliever:  Italy's Salleo – one of just two men currently listed on the Rubikon Web site as members of that "highly distinguished" advisory board.

What's next for this smoke and mirrors outfit?  At long last, there seems to be at least a modicum of interest from law enforcement regarding the company's activities.

Much of the fishiest selling in GlobeTel stock seems to have originated from the Boca Raton office of the brokerage Raymond James, where several of the company's top insiders maintained accounts.

In March, the broker handling those accounts was abruptly dismissed, after which the firm's compliance officials began ordering his clients to withdraw their money, close down their accounts and take their business elsewhere.   Was   the   action triggered by inquiries from the Feds?  If so, great!

And if the Amex can permit this scam-spewing monstrosity to continue trading in the face of all that has happened, then maybe the Amex itself should be closed.

The regulators of Wall Street may lack the power to arrest the burglars, but they certainly have the right to seize the gang's burglary tools.

42.   The next day, GlobeTel issued a statement in response to the above article.

GlobeTel continued to deny any wrongdoing.  The article stated in relevant part:

**GlobeTel Addresses Christopher Byron's NY Post Statements**

FORT LAUDERDALE, Fla.—(BUSINESS WIRE)—May 23, 2006— GlobeTel Communications Corp. (AMEX:GTE), today responded to the series of misrepresentations and malicious distortions which the

New York Post portrays as financial journalism, written by SEC critic Christopher Byron, with the following statements from Chairman J. Randolph Dumas and Chief Executive Officer Timothy Huff.

J. Randolph Dumas stated, "Apart from the libelous commentary which is rampant throughout this ridiculous article, we are also quite suspect of the timing of this story, appearing as it does on the exact day that a certain New York bank was obligated to cover the short position which it acquired "in error" late last week on behalf of a client.  Even worse, is the gross irresponsibility by the editorial management of the New York Post and on the part of Christopher Byron in the conveyance of information for which apparently no fact-checking occurred.  For instance, Rubikon Partners, which I previously managed and which my distinguished colleagues and I co-founded is, in fact, a private equity firm and has never had any connection whatsoever to GlobeTel and it has never had any operational activities in London, England, including any 'internet banking' business."

"Any reasonably competent individual can easily Google us and find accurate information about Rubikon Partners and my esteemed fellow Founding Shareholders.  I am deeply disappointed that Mr. Byron has elected to make such damaging implications about these men, of legendary personal and professional status, when they have absolutely nothing to do with GlobeTel.  And, to attach to any of us implications of illegal money laundering, is simply out of all reasonable bounds.  We remained stunned that he has chosen to make this series of intentionally hostile and totally misrepresentative statements about our company, our Board Members, our affiliates and our objectives.  We can only speculate and discuss with the regulatory authorities (as we have done over the past few days) the facts surrounding these apparently coordinated attacks which have been launched against our company recently by a series of law firms, tabloid journalists and professional short-sellers.

"GlobeTel's management has continued to focus its attention on its core business units and a number of significant new business opportunities over the past few months.  And, we have attempted to do this in the fact of the most damaging and distressing environment that these people can possibly orchestrate.  These actions have removed hundreds of millions of dollars of share value from the pockets of our shareholders.  Like Mr. Byron, I can only hope that the regulatory authorities who are charged with investigating these kinds of actions will leap directly into the middle

26

of these sordid events.  It is hard to conceive that this sort of thing is allowed to occur in America."

CEO Timothy Huff added, "Regarding his many erroneous statements about GlobeTel, Mr. Byron should also be aware that we do not build 'aluminum blimps that bounce signals from Latin America to the US.'  We create and construct rigid-infrastructure, GPS-guided airships designed to transmit wireless signals to, and from, our clients in each airship's significant coverage area.  We have invested a great deal of time and money in the development of this 'near space' technology over the past three years.  Our entire team of former NASA engineers – along with GlobeTel's managers – remain very excited about and committed to this technology, along with many of our military and government supporters.  We hope, therefore, that before the end of the summer, we will be able to expose Mr. Byron's half-witted comments for what they are:  damaging libel."

Mr. Huff continued, "Also, I suggest Mr. Byron stick to his journalistic pornography if he truly believes that anything about our HotZone 4010 technology includes the building of a cell phone tower network.  Never has GlobeTel stated it was in the cell phone business.  The contemplated transaction in Russia and our other pilot-programs at GlobeTel Wireless, are based entirely upon non-tower-based Wifi, WiMax and DECT capabilities.  Indeed, our HotZone 4010 wireless technology is housed in a regional transmitter, which is smaller than a shoebox, providing high speed, broadband Internet connectivity and VoIP telephony to large areas within municipal areas.

"Finally, Mr. Byron either needs to learn more about the telecommunications industry or he should actually take the time to read our press released if he thinks the rollout of VozBrasil, our VoIP network for Brazil and Brazilian-Americans, is in any way designed to launder or transfer money.  Like his other libelous comments, he attacks us for providing a service targeted at the average man-on-the street who must otherwise pay large sums for long-distance telephone calls to and from his home market.  But, of course, these distorted and twisted claims are well known by Mr. Byron to be entirely false and misleading.  His objective has not been accuracy."

43.     Due to the controversy surrounding the Company's stock, on June 13,

2006, Wall Street published the article, *Can GlobeTel Continue to Weather the Storm?*

In relevant part, the article stated the following:

> The last few months have been no picnic for GlobeTel
> Communications Corp. (AMEX: GTE Quotes, News, Charts).
>
> In early April, The Motley Fool published an article lambasting the
> Florida-based communications services provider for not answering
> the hard questions, and for painting a skewed picture of its
> prospects to its investors.
>
> "The raw numbers alone ought to be enough to frighten investors,"
> the article stated, citing GlobeTel's $32 million, or 43 cents per-
> share loss in 2005, its scant $413,679 gross profit on revenues of
> $81 million, and its 85 percent increase in compensation for
> directors.
>
> A few weeks after the article at The Motley Fool, GlobeTel issued a
> default notice to Russia-based W/MAX provided, Internafta for a
> deal that was valued at $600 million, and called for GlobeTel to roll
> out networks to 10 cities in three stages, over a period of 27
> months.
>
> GlobeTel claimed it put the kibosh on the deal because Internafta
> failed to pay any of the $600 million that was agreed upon.
>
> A slew of class action suits followed, alleging that GlobeTel misled
> shareholders with statements about the size and certainty of the
> Internafta deal.
>
> And then came an article about GlobeTel in the New York Post by
> writer Christopher Byron, which stated, "this penny stock vampire
> must be exorcised from the capital markets," and that GlobeTel
> management engaged in trickery to create "the illusion of value in a
> worthless penny stock."  The article focused on GlobeTel's
> continued efforts to create an "illusion of value" through "pump-and-
> dump" cycles that "sent an astounding 1.1 billion shares of its stock
> churning through the market," and suspicious selling that "seems to
> have originated from the Boca Raton office of the brokerage
> Raymond James, where several of the company's top insiders
> maintained accounts."

28

The article went on to question GlobeTel's involvement with London-based investment firm, Rubikon Partners, where GlobeTel's current Chairman, J. Randolph Dumas, served as a partner.

The Company responded with a pointed press release in which Dumas accused Bryon and the Post of Poor reporting, and pointed to a few misnomers in the piece.

"Apart from the libelous commentary which is rampant throughout this ridiculous article, we are also quite suspect of the timing of this story, appearing as it does on the exact day that a certain New York bank was obligated to cover the short position which it acquired 'in error' late last week on behalf of a client," the press release stated, "Even worse, is the gross irresponsibility by the editorial management of the New York Post and on the part of Christopher Byron in the conveyance of information for which apparently no fact-checking occurred."

Regarding GLobeTel's ties to Rubikon, Dumas stated in the press release: "Rubikon Partners, which I previously managed and which my distinguished colleagues and I co-founded is, in fact, a private equity firm and has never had any connection whatsoever to GlobeTel and it has never had any operational activities in London, England, including any 'internet banking' business."

On May 30, Rubikon's President Thomas McLarty stated: "I have no connection to GlobeTel or its business, nor is there any business relationship between Rubikon and GlobeTel. We are not partners, investors, advisers or involved in any way."

GlobeTel has hired Randy Dumas, who is also associated with Rubikon, and that is where the story begins and ends."

GlobeTel's CEO Timothy Huff, who was chided in the Motley Fool article, stated that the negative press has not come in the way of GlobeTel's success, and that the Company's five divisions are "doing very well and have a good chance of doing very well in their market sectors," adding that "each of these divisions have multi-billion dollar opportunities, I think, in their market sector, and we're just starting at the beginning of those opportunities that lay out there."

## DEMAND WOULD BE FUTILE

44.     The Defendant directors face a substantial likelihood of liability in this action because of the Company issued false and misleading statements concerning the Company's business practices, internal controls, and omitted material information regarding GlobeTel's falsified financial results.  Several of these statements touted the consummation of a $600 million deal with a Moscow-based company name LLC Internafta, to install wireless networks in Russia's 30 largest cities.  The truth, however, was that no such company existed and that the deal, like many of GlobeTel's other business ventures was in reality a sham.  The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight.  These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company as the Company's common stock traded at artificially inflated levels.

45.     At the time of filing this lawsuit, the members of the Board are Defendants Dumas, Huff, Leinwand, Salleo, Klein, and Costellano.

## Likelihood of Substantial Liability
## of the Audit Committee Defendants

46.     Defendant Directors Castellano, Klein, and McMahan also had enhanced responsibilities as members of the Company's Audit Committee.  That Committee was charged with direct responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.

30

**Additional Likelihood of Substantial Liability
of Other Board Members**

47.    Defendant Directors Dumas, Huff, Leinwand, Salleo and Siegel are also exposed to substantial potential liability in this action because of their complete failure to put appropriate financial and legal compliance controls in place to assure the accuracy of financial information disclosed by the company to the public.

48.    In addition, Defendant Directors Castellano, Klein, and Salleo are member of the Company's Compensation Committee.  Defendant Castellano was determined by the Board as an audit committee financial expert.  As a person of special knowledge and talents, more is expected of Castellano in preventing and ferreting out fraud and inadequate financial controls. That Committee was charged with direct responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls. In those positions, they approved compensation plans for senior executives and directors, pursuant to which millions of dollars were paid out by the Company based on financial results that have now turned out to be grossly inflated.

**Each Director Defendant Lacks Independence**

49.    Defendant Director Dumas, as the Company's current Chairman, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

50.    Defendant Direct Huff, as the Company's current Chief Executive Officer, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants

31

51.     Defendant Director Leinwand, as the Company's current General Counsel, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

52.     Defendant Directors Castellano, Klein, and Salleo are members of the Board's Compensation Committee, and so, as described above, lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

53.     Plaintiff has not made any demand on the shareholders of GlobeTel to institute this action since demand would be a futile and useless act for the following reasons:

> a.   GlobeTel is a publicly held company with approximately 102,808,081 shares outstanding, and thousands of shareholders;
>
> b.   Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and
>
> c.   Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

54.     GlobeTel has expended and will continue to expand significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts and the costs and expenses related to the securities class actions filed against the Company.

55.     Additionally, Derivative Plaintiff has not made a demand on the Board of Directors to bring these causes of action because such a demand would be futile and useless act for the following reasons:

a.  Director Defendants Dumas, Huff and Klein because of their inter-related business and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. Huff and Dumas' personal and business relationship extends back fifteen (15) years. Also, Dumas and Klein co-founded Rubikon Partners, what they allege is a private equity firm focusing on European leveraged buyouts. However, U.K. authorities say Rubikon is an unregistered Internet bank that investors should avoid. Klein currently serves as the Managing Partner of Rubikon Partners, a private equity firm. During their several years of working together, Defendants Dumas, Huff, and Klein developed a social and professional relationship from which it is reasonable to conclude that they would not authorize suit against each other. Therefore, demand on Defendants Dumas, Huff and Klein is futile.

b.  Defendant Huff is considered an inside Director because of his employment as President and Chief Executive Office of the Company and is therefore not considered an independent director. Defendant Huff also serves as a director of Consolidated Global Investments, Ltd., a publicly held Australian company and 71% owned subsidiary of the Company. Because of Defendant Huff's employment relationship with the Company and inter-related business relationships, demand on Defendant Huff is futile.

c.  Defendant Leinwand is considered an inside Director because of his employment as General Counsel of the Company and is therefore not considered an independent director. Because of Defendant Leinwand's employment relationship with the Company, demand on Defendant Leinwand is futile.

d.  Defendants Klein and Dumas have also formed inter-related business relationships as both are affiliated with Bankers Trust, a historic US banking organization. It is reasonable to conclude that they would not authorize suit against each other. Therefore, demand on Klein or Dumas is futile.

e.  In order to bring this suit, a majority of the Directors of GlobeTel would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

f.  The acts complained of constitute violations of the fiduciary duties owed by GlobeTel's officers and directors and these acts are incapable of ratification.

33

g.   GlobeTel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for GlobeTel any part of the damages GlobeTel suffered and will suffer thereby.

h.   The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

i.   Any suit by the directors of GlobeTel to remedy these wrongs would likely expose the Director Defendants and GlobeTel to further violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

j.   Making demand on all shareholders would also force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

## FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

56.   Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 55 above, as if set forth full herein.

57.   The Individual Defendants owed and owe GlobeTel fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe GlobeTel the highest obligation of good faith, fair dealing, loyalty and due care.

58.   The Individual Defendants, each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

L:\1226-001\15734.doc

59.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

60.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, GlobeTel has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

61.     Plaintiff, on behalf of GlobeTel, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

62.     Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 55 above, as if set forth fully herein.

63.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability of control and influence GlobeTel, for which they are legally responsible.

64.     As a direct and proximate result of the Individual Defendants' abuse of control, GlobeTel has sustained significant damages.

65.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

66.     Plaintiff, on behalf of GlobeTel has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants
### for Gross Mismanagement

67.     Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 55 above, as if set forth fully herein.

68.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GlobeTel in a manner consistent with the operations of a publicly held corporation.

69.     As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GlobeTel has sustained significant damages in excess of millions of dollars.

70.     Plaintiff, on behalf on GlobeTel, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against the Individual Defendants
### for Waste of Corporate Assets

71.     Plaintiff incorporates by references and realleges each and every allegation contained in Paragraphs 1 through 55 above, as if set forth fully herein.

72.     As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused GlobeTel to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

36

73.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

74.     Plaintiff, on behalf of GlobeTel, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Defendants
### for Unjust Enrichment

75.     Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 55 above, as if set forth fully herein.

76.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GlobeTel.

77.     Plaintiff, as shareholder and representative of GlobeTel, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Diana Stockton, prays for relief and judgment as follows:

A.     Against the Individual and Director Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual

Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding to GlobeTel restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.


Dated:  June 26, 2006          Respectfully Submitted,

Wayne H. Schwartz
(Florida Bar No. 907390)
Eric Lee
(Florida Bar No. 961299)
LEE & AMTZIS, P.L.
5550 Glades Rd., Suite 401
Boca Raton, FL 33431
Phone: (561) 981-9988
Fax:    (561) 981-9980
Local Counsel for Plaintiff

-and-

William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Phone: (405) 235-1560
Fax:    (405) 239-2112
Lead Counsel for Plaintiff

38

-and-

Marc Henzel
LAW OFFICES OF MARC HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Phone: (610) 660-8000
Fax:     (610) 660-8080
Co-counsel for Plaintiff

## VERIFICATION

I, __DIANA STOCKTON__, declare that I have reviewed the Complaint ("Complaint") prepared on behalf of **GlobeTel Communications Corp. (GTE)** and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

__5/16/06__
Date

__Diana Stockton__
Signature

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
DIANA STOCKTON MAGISTRATE JUDGE SNOW
State of Texas

**DEFENDANTS**
J. Randolph Dumas, et al.
London, England

(b) County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Wayne H. Schwartz
Lee + Amtzis P.L
5550 Glades Road, Suite 401
Boca Raton, FL / 33431
561.981.9988

CIV-COHN

06-60923

Attorneys (If Known)

(d) Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

0:06 CV 60923 Cohn-LSS

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 362 Personal Injury - Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☒ NO
b) Related Cases ☒ YES ☐ NO
JUDGE Jordan
DOCKET NUMBER 06-21174

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. § 1332 Shareholder derivative lawsuit

LENGTH OF TRIAL via 7 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 75,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD
DATE 6.26.06

FOR OFFICE USE ONLY
AMOUNT 350.00 RECEIPT # 537486